JONATHAN J. DELSHAD, Bar No. 246176
LAW OFFICES OF JONATHAN J. DELSHAD, PC.
1663 Sawtelle Blvd., Suite 220
Los Angeles, CA 90025
Telephone:   424.255.8376
Fax:          424.256.7899
E-mail: jdelshad@delshadlegal.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jeremy Kahn, Andrew Brindle, Lynn Auriemma, Christopher Johnson, Christopher Pollak, Oscar Sevilla, each individually, and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>WELLS FARGO BANK & COMPANY, a Delaware Corporation; WELLS FARGO BANK, NATIONAL ASSOCIATION; WELLS FARGO SECURITIES, LLC and DOES 1 through 50, inclusive,<br><br>    Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF:**<br><br>1. Violation of Sarbanes Oxley.<br>2. Violation of FLSA<br>3. Declaratory / Injunctive Relief<br>4. Violation of Dodd Frank Act.<br><br>**JURY TRIAL DEMANDED** |

COME NOW Plaintiffs Jeremy Kahn, Andrew Brindle, Lynn Auriemma, Christopher Johnson, Christopher Pollak, and Oscar Sevilla for causes of action and allege as follows:

## PARTIES

1.     Jeremy Kahn, Andrew Brindle, Lynn Auriemma, Christopher Johnson, Christopher Pollak, and Oscar Sevilla (hereinafter referred to as "Named Plaintiffs") were at all relevant

Law Offices of Jonathan J. Delshad, PC
1663 Sawtelle Blvd, Suite 220
Los Angeles, CA 90025

times herein employed by WELLS FARGO BANK & COMPANY and WELLS FARGO BANK, NATIONAL ASSOCIATION, and WELLS FARGO SECURITIES, LLC (hereinafter collectively referred to as "**Wells Fargo**" or "**Defendants**").

## INTRODUCTION TO THE CLAIMS

2.      Wells Fargo implemented a fraudulent scheme and scam to increase Wells Fargo stock price by aggressively pushing their employees to open accounts to increase their cross-sell numbers and not putting any barriers or checks in place to see if the accounts were fraudulently and illegally opened or not. The scheme was orchestrated by the CEO John Stumpf who wanted to have Wells Fargo customers have an average of 8 accounts per person regardless of whether the customers needed those accounts.   This fraudulent scam was efficiently and identically perpetrated among all branches, and pushed to all bankers of Wells Fargo nationwide.

3.      In his time as chairman and CEO of Wells Fargo, John Stumpf has been famous for cross-selling, which is pushing existing customers to open more accounts. Cross-selling is one of the main reasons that Wells Fargo has become the most valuable bank in the world. Wells Fargo measures cross-selling by the number of different accounts a customers has with Wells Fargo. In 12 conference calls, CEO of Wells Fargo, John Stumpf personally cited Wells Fargo's success at cross-selling retail accounts as one of the main reasons to buy more stock in the company. Wells Fargo was aware that many of the accounts that were being open were either illegally opened, unwanted, carried a zero balance, or were simply a result of unethical business practices described below.   Wells Fargo knew that their unreasonable quotas were driving these unethical behaviors that were used to fraudulently increase their stock price and benefit the CEO at the expense of the low level employees.

4.      Whereas the average bank had 3 products per customer, Wells Fargo had 6, but Wells Fargo was not happy there. Wells Fargo pushed for a goal of 8 per customer.  To reach this goal, Wells Fargo placed knowingly unrealistic and impossible cross sell quotas on their bankers.

Law Offices of Jonathan J. Delshad, PC
11663 Sawtelle Blvd. Suite 220
Los Angeles, CA 90025

Bridle v. Wells Fargo - Complaint For Damages

Law Offices of Jonathan J. Delshad, PC
11663 Santella Blvd. Suite 220
Los Angeles, CA 90025

5.      Wells Fargo's fraudulent scam which was set at the top and directed toward the bottom was to squeeze employees to the breaking point so they would cheat customers so that the CEO could drive up the value of Wells Fargo stock and put hundreds of millions of dollars in his own pocket. Wells Fargo could then place the blame on thousands of $12 an hour employees who were just trying to meet cross-sell quotas that made executives including the CEO rich.

6.      Those that bought Wells Fargo stock based on the scam have not lost much as the stock price has still soared over the past 5 years.  Those customers that had accounts that were opened fraudulently will undoubtedly be compensated for any fees they were forced to pay and can easily close their accounts and move on with their lives without much concern.

7.      The biggest victims of this scheme are a class of people that nobody else has acknowledged.  The biggest victims of Wells Fargo's scam is the class of victims that Wells Fargo fired because they did not meet these cross sell quotas by engaging in the fraudulent scam that would line the CEO's pockets.  The honest employees with a conscious who tried to meet the sales quotas ethically and without engaging in fraudulent scams despite pressure to do so are the biggest victims of Wells Fargo's scam.  They are the employees that this lawsuit seeks to redress.

8.      In order to be able to perpetrate their fraudulent scam, Wells Fargo fired employees who did not meet their impossible quotas. Without firing or demoting employees who failed to perpetuate the scam, Wells Fargo could not sufficiently "motivate" or encourage those employees who met impossible quotas by taking fraudulent and illegal actions to increase "cross sells" so that Wells Fargo's stock price would double.

9.      Defendant Wells Fargo & Company is, and at all times relevant hereto was, a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in San Francisco, California. Wells Fargo & Company is a financial services company with $1.5 trillion in assets, and provides banking, insurance, investments, mortgage, and consumer and commercial finance through more than 9,000 locations, 12,000 ATMs, and the Internet. It has approximately 265,000 full-time employees, and is ranked 29th on Fortune Magazine's 2014 rankings of America's 500 largest corporations.

10.     Defendant Wells Fargo Bank, National Association is, and at all times relevant hereto was, a national banking association chartered under the laws of the United States, with its primary place of business in Sioux Falls, South Dakota. Wells Fargo Bank, National Association provides Wells Fargo & Company's personal and commercial banking services, and is Wells Fargo & Company's principal subsidiary.

11.     Named Plaintiffs will ask leave of Court to amend this complaint to reflect the defendants true names and capacities when the same have been ascertained if not correctly named as of yet. Named Plaintiffs are informed and believe, and thereon allege, that each of said defendants are responsible, jointly and severally, for the events and injuries described herein and caused damages thereby to plaintiff as alleged herein.

12.     It further is alleged that defendants, each and together, at all times relevant hereto, constituted an "integrated enterprise" with interrelated operations, common management, centralized control of labor relations, and common ownership and/or financial control.

13.     On information and belief, it further is alleged that the defendants were at all times relevant hereto, the alter egos of each other such that to affirm the legal separateness of the defendants for purposes of the claims presented in this action would lead to an injustice and/or inequitable result. There is a unity of interest and ownership between the company and its equitable owner(s) that the separate personalities of the company and its shareholders do not in reality exist. Defendants exhibit an interrelation of operations, commingling of funds, lack of observation of corporate formalities, undercapitalization, centralized control, common management, and common financial control such that they are an integrated enterprise and/or are alter egos. The company is a mere shell, instrumentality, and conduit through which the individual defendant(s) carried on their business, exercising complete control and dominance of such business to the extent that any individuality or separateness of the defendants does not and did not exist.

14.     Named Plaintiffs are informed and believe and thereon allege that at all times herein mentioned each of the defendants was acting as the partner, agent, servant, and employee of

Law Offices of Jonathan J. Delshad, PC
11663 Sawtelle Blvd. Suite 220
Los Angeles, CA 90025

- 4 -

Law Offices of Jonathan J. Delshad, PC
11663 San-ielle Blvd, Suite 220
Los Angeles, CA 90025

1 | each of the remaining defendants, and in doing the things alleged herein was acting within the

2 | course and scope of such agency and with the knowledge of the remaining defendants.

3 | 15.    Defendant Wells Fargo & Company operates the fourth biggest bank in the United

4 | States, and the largest bank headquartered in California. It is California's oldest bank, having

5 | begun banking services in 1852. Wells Fargo Bank, National Association is a subsidiary of

6 | Wells Fargo & Company, and provides most of the banking products and services that are the

7 | subject of this action.

8 | 16.    Wells Fargo boasts about the average number of products held by its customers,

9 | currently approximately six bank accounts or financial products per customer. Wells Fargo

10 | seeks to increase this to an average of eight bank accounts or financial products per account

11 | holder, a company goal Wells Fargo calls the "Gr-eight" initiative.

12 | 17.    For years, Wells Fargo has victimized their customers by using pernicious and often

13 | illegal sales tactics to maintain high levels of sales of their banking and financial products. The

14 | banking business model employed by Wells Fargo is based on selling customers multiple

15 | banking products, which Wells Fargo calls "solutions."

16 | 18.    In order to achieve its goal of selling a high number of "solutions" to each customer,

17 | Wells Fargo imposes unrealistic sales quotas on its employees and has fired or demoted

18 | employees who do not meet this unrealistic quota.

19 | 19.    Wells Fargo has adopted policies that have, predictably and naturally, encouraged

20 | bankers to engage in fraudulent behavior to meet those unreachable goals or else be fired or

21 | demoted as result of not engaging in fraudulent behavior.

22 | 20.    As a result, Wells Fargo's employees who did NOT engage in unfair, unlawful, and

23 | fraudulent conduct to meet quotas were all similarly, systematically and routinely demoted,

24 | terminated and made an example of so that all other employees would realize that they must

25 | engage in these fraudulent actions in order to meet the unrealistic sales quotas or be terminated.

26 | 21.    Wells Fargo has known about and encouraged these practices for years. Wells Fargo

27 | encouraged bankers to systematically and uniformly open illegal accounts without clients'

28 | authorization.   Wells Fargo would uniformly and consistently train managers to provide

bankers with a pre-signed application and encourage bankers to open as many accounts as possible under such pre-signed application. Wells Fargo fired or demoted employees who failed to meet unrealistic quotas while at the same time providing promotions to employees who met these quotas by opening fraudulent accounts. Through these illegal and systematic practices, the common scheme of opening fraudulent accounts happened at each and every Wells Fargo branch without exception.

22.     The extent and commonality of this fraudulent scheme is evident from the 5,000 or so employees that Wells Fargo had to fire as a result of this fraud coming to light.

23.     The extent and commonality of Wells Fargo's illegal actions was unknowns before recent federal hearing in which Wells Fargo's CEO has since apologized for the failure and has since agreed to end its sales quota system at the end of the year. It also plans to reach out to all customers going back to 2009 to verify whether the accounts were authorized.

24.     Moreover, Wells Fargo continued to impose the same companywide goals of attaining as many accounts as possible at any expense, thereby fostering the practice of gaming. Wells Fargo thus puts its employees between a rock and a hard place, forcing them to choose between keeping their jobs and opening unauthorized accounts.

25.     Yet nothing is being done for the thousands of employees who were demoted or fired for opposing or failing to engage in the illegal practices that Wells Fargo finally looks to end.

26.     Wells Fargo's resulting market dominance has come at a significant price to employees who are not willing to engage in fraudulent activity, because it has been achieved in large part through an ambitious and strictly enforced sales quota system. Wells Fargo quotas are difficult for many bankers to meet without resorting to the abusive and fraudulent tactics described further below. Therefore, thousands of employees who failed to resort to illegal tactics were either demoted or fired as result.

27.     Moreover, Wells Fargo enforces its sales quotas by constant monitoring. Daily sales for each branch, and each sales employee, are reported and discussed by Wells Fargo's District Managers four times a day, at11:00 a.m., 1:00 p.m., 3:00 p.m., and 5:00 p.m. Those failing to meet daily sales quotas are approached by management, and often reprimanded and/or told to

Law Offices of Jonathan J. Delshad, PC
11663 Sawtelle Blvd, Suite 220
Los Angeles, CA 90025

"do whatever it takes" to meet their individual sales quotas. Consequently, Wells Fargo's managers and bankers have for years engaged in practices called "gaming." Gaming consists of, among other things, opening and manipulating fee-generating customer accounts through often unfair, fraudulent, and unlawful means, such as omitting signatures and adding unwanted secondary accounts to primary accounts without permission. Other practices utilized as part of these "gaming" schemes have included misrepresenting the costs, benefits, fees, and/or attendant services that come with an account or product, all in order to meet sales quotas.

28.     These gaming practices are so pervasive in Wells Fargo's business model that some methods of gaming have even been given their own names, For example:

    a.   *"Sandbagging"* refers to Wells Fargo's practice of failing to open accounts when requested by customers, and instead accumulating a number of account applications to be opened at a later date. Specifically, Wells Fargo employees collect manual applications for various products, stockpile them in an unsecured fashion, and belatedly open up the accounts (often with additional, unauthorized accounts) in the next sales reporting period, frequently before or after banking hours, or on bank holidays such as New Year's Day.

    b.   *"Pinning"* refers to Wells Fargo's practice of assigning, without customer authorization, Personal Identification Numbers ("PINs") to customer ATM card numbers with the intention of, among other things, impersonating customers on Wells Fargo computers, and enrolling those customers in online banking and online bill paying without their consent.

    c.   *"Bundling"* refers to Wells Fargo's practice of incorrectly informing customers that certain products are available only in packages with other products such as additional accounts, insurance, annuities, and retirement plans.

(See "Banker Assessment Presentation" internal memo highlighting Wells Fargo's policy mandating employees to open accounts regardless of customers objections, attached hereto as **Exhibit 1**).

Law Offices of Jonathan J. Delshad, PC
11663 Sawtelle Blvd. Suite 220
Los Angeles, CA 90025

29.     Wells Fargo has rewarded employees for these "gaming" practices. Wells Fargo has encouraged gaming by promoting those who "gamed" customers the most to positions of authority and thereby and perpetuating the problem. Worst of all, employees who did not "game" were surely demoted and / or fired.  Once it became public knowledge that Wells Fargo was encouraging illegal behavior by terminating or demoting employees for not meeting the quota, Wells Fargo ceased to use the quota.  However those employees who lost their job as a result of not engaging in illegal activity to meet quotas were never compensated.

30.     Defendants hired Named Plaintiffs to meet certain "solutions" quotas each day.  Each of the Named Plaintiffs was demoted and/or terminated as a result of not meeting such quotas because Named Plaintiffs opposed and would not engage the illegal "gaming" practiced described above to meet such quotas like other employees employed with Wells Fargo.

31.     The class of Plaintiffs covered by this case ("**Plaintiff Class**") is defined as all employees in the United States who worked for Wells Fargo at any time in the ten years preceding the filing date of this complaint or who continue to work for Wells Fargo and were either demoted, forced to resign, or terminated for the performance based reason of not meeting their "solutions" quota. The Plaintiff Class and Named Plaintiffs are hereinafter collectively referred to as ("**Plaintiffs**").

32.     Named Plaintiffs bring this action on their own behalf, on behalf of the general public, and on behalf of all "aggrieved persons" and all other persons similarly situated within the Plaintiff Class of employees who were unlawfully demoted, retaliated against and/or terminated by Defendant within the United States at any time between the date 10 years prior to the filing of this complaint and the date of entry of judgment after trial as further set forth below.

33.     Named Plaintiffs do not know the true names or capacities of defendants sued herein as Does 1 through 50, inclusive and Named Plaintiffs sue these defendants by such fictitious names. Named Plaintiffs will seek to amend this Complaint and include these Doe Defendants' true names and capacities as soon as they can be reasonably ascertained. Doe Defendants may

- 8 -

include other individuals holding an ownership interest in the Defendants' business. Doe Defendants may include other joint employer entities.

34.     Named Plaintiffs worked for Wells Fargo at various times during the relevant time period. Named Plaintiffs were told that they had to meet certain quota of "solutions" a day. Wells Fargo was aware or should have known that their quotas of "solutions" was unreachable by legitimate means and expected these employees to reach such quotas through unethical and or illegal means.  As a result of Named Plaintiffs' reluctance to meet the quotas by "gaming," the Named Plaintiffs were counseled, demoted and/ or later terminated.  Named Plaintiffs suffered both economic and non-economic damages including loss of income, back and front pay, and emotional distress.

## JURISDICTION AND VENUE

35.     Venue is proper in the Central District of California because named Plaintiffs Christopher Johnson and Jeremy Kahn are residents of the Central District of California, because named Plaintiffs Christopher Johnson and Jeremy Kahn performed work for Defendants within the Central District of California and because Defendants regularly conduct business within the Central District of California and own and operate numerous facilities - and employ numerous putative class members within the Central District of California. The Defendants' liability to the Plaintiffs arose in part within the Central District of California and some of the wrongful acts complained of occurred within the Central District of California.

36.     Federal Question jurisdiction is raised by the causes of action alleged in this complaint.

## CLASS ACTION ALLEGATIONS

37.     Named Plaintiffs bring this action on their own behalf and on behalf of the class set forth above.

38.     **Numerosity/Impracticability of Joinder:** The members of the Class are so numerous that joinder of all members would be impractical. The members of the class are so numerous that joinder of all members would be unfeasible and impractical. Named Plaintiffs are

*Law Offices of Jonathan J. Delshad, PC*
*11663 Sawtelle Blvd. Suite 220*
*Los Angeles, CA 90025*

Law Offices of Jonathan J. Delshad, PC
11663 Sawtelle Blvd, Suite 220
Los Angeles, CA 90025

1  informed and believes, and on that basis alleges that there are well over 50 persons within the
2  Plaintiff Class. The identity of individuals qualifying for class membership is readily
3  ascertainable via inspection of the personnel records and other documents maintained by
4  Defendants.

5  39.    **Commonality and Predominance:** There are common questions of law and fact that
6  predominate over any questions affecting only individual members of the class so that a class
7  action is superior to other forms of action. The claims of the Named Plaintiffs are typical of
8  those of every other member of the Plaintiff Class. All the class members were treated in a
9  similar fashion and suffered similar harm as a consequence of Defendants' conduct, as alleged,
10 and Defendants' demotion and/or termination of Named Plaintiffs' employment for failing to
11 meet the strictly enforced sales quotas that were so unrealistic that Defendant coached
12 employees to deploy fraudulent sales practices, and retaliation towards those employees who
13 did not engage in fraudulent practices to warn other employees not to avoid using systematic
14 fraudulent practices to avoid demotions or termination of employment, are and were uniform
15 between class members.

16 40.    For Named Plaintiffs and the Class, the common legal and factual questions include,
17 but are not limited to the following:

18
19     A. Whether Wells Fargo knew or should have known that its sales quota of 10 accounts
20 per day and goal of 8 accounts per customer would require employees to engage in unlawful,
21 deceptive, fraudulent or unethical practices in order to boost their stock price;

22     B. Whether Wells Fargo knew or should have known that firing employees who failed
23 to meet unrealistic quotas would result in the remaining additional unlawful "gaming"
24 practices;

25
26     C. Whether, as a result of Wells Fargo's conduct, Plaintiffs and the Class have suffered
27 damages; and if so, the appropriate amount thereof; and

28

Law Offices of Jonathan J. Delshad, PC
11663 Sawtelle Blvd. Suite 220
Los Angeles, CA 90025

D. Whether as a result of Wells Fargo's misconduct, Plaintiffs and the Class are entitled to equitable and declaratory relief, and, if so, the nature of such relief.

41. **Typicality**: The Named Plaintiffs claims are typical of the claims of the members of the Class. Plaintiffs and all the members of the class have been injured by the same wrongful practices of Wells Fargo. Named Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the class and are based on the same legal theories. Named Plaintiffs will fairly and adequately represent the interests of the Plaintiff Class because Named Plaintiffs are a member of the class and Named Plaintiffs do not have an interest that is contrary to or in conflict with those of the Plaintiff Class. There is a well-defined community of interest in the questions of law and fact affecting the class of persons that Named Plaintiff represents as a whole. Each member of the Plaintiff Class was subjected to illegal practices of Defendants under SEC regulations, FLSA, The Dodd Frank Act, and the Sarbanes Oxley Act.

42. **Superiority:** A class action is superior to any other form of action for the fair and efficient adjudication of this lawsuit. Individual employees such as Plaintiffs have a difficult time prosecuting an individual action against large corporate employers such as Defendants. Even if any class member could afford individual litigation against Defendants, it would be unduly burdensome to the court system. Individual litigation of such numerous claims magnifies the delay and expense to all parties and the court system. By contrast, a class action presents far fewer management difficulties and affords the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court. Concentrating this litigation in one forum will promote judicial economy and parity among the claims of individual class members and judicial consistency in rulings. Notice of the pendency and any resolution of this action can be efficiently provided to class members by mail, print, broadcast, internet, and/or multimedia publication. Requiring each class member to both establish individual liability and pursue and individual remedy would discourage the assertion of lawful claims by employees who would be disinclined to pursue an action against their present and/or

1  former employer for fear of retaliation and permanent damage to their careers at present and/or
2  subsequent employment. Proof of a common business practice or factual pattern, of which the
3  Named Plaintiffs experienced, is representative of the alleged class and will establish the right
4  of each of the members of the alleged class to recovery on the claims alleged herein.

5  43.    The prosecution of separate actions by individual class members, even if possible,
6  would create: (a) a substantial risk of inconvenient or varying verdicts or adjudications with
7  respect to the individual class members against the defendants herein; and/or (b) legal
8  determinations with respect to individual class members which would, as a practical matter, be
9  dispositive of the other class members not parties to the adjudications or which would
10 substantially impair or impede the ability of class members to protect their interests. Further,
11 the claims of the individual members of the class are not sufficiently large to warrant vigorous
12 individual prosecution considering all of the concomitant costs and expenses attending thereto.
13 Plaintiff is unaware of any difficulties that are likely to be encountered in the management of
14 this action that would preclude its maintenance as a class action.

15 44.    **Adequacy:** Named Plaintiffs are representatives who will fully and adequately assert
16 and protect the interests of the Class, and have retained class counsel who are experienced and
17 qualified in prosecuting class actions. Neither Named Plaintiffs nor their attorneys have any
18 interests contrary to or in conflict with the Class.

19 45.    Named Plaintiffs do not anticipate any difficulty in the management of this litigation.

20 46.    Wells Fargo has, or has access to, address and/or other contact information for the
21 members of the class, which may be used for the purpose of providing notice of the pendency
22 of this action.

23 47.    Named Plaintiffs request permission to amend the complaint to include other
24 individuals as class representatives in the event that any of the Named Plaintiffs are deemed
25 not to be an adequate representative of the Plaintiff Class. Named Plaintiffs further requests
26 permission to amend the complaint to revise the Plaintiff Class definition as appropriate after
27 discovery.

28

Law Offices of Jonathan J. Oehhad, PC
11663 Sawtelle Blvd. Suite 220
Los Angeles, CA 90025

Bridle v. Wells Fargo - Complaint For Damages

48.   Wells Fargo knew, or in the exercise of reasonable care should have known, that its employees open unauthorized accounts. For example:

    a.   Customers often enter Wells Fargo's branches to complain about unauthorized accounts; many victims have even contacted Wells Fargo management by telephone.

    b.   Wells Fargo has access to, and frequently monitors, actions taken on its computers by employees. Wells Fargo has been put on notice by unusual activity such as: numerous accounts being opened on January 1, a bank holiday; numerous unfunded accounts; frequent reopening of closed accounts; and customer accounts with the only account activity being Wells Fargo fees;

    c.   Wells Fargo requires that all new customer accounts be approved by a branch manager or assistant manager, thereby providing Wells Fargo management with a clear record of the number and types of accounts opened for each customer.

    d.   Wells Fargo is also aware its daily, weekly and monthly quotas are unrealistic for employees during normal working hours, since they have generated numerous complaints and lawsuits by employees.

    e.   Online banking accounts are often opened by Wells Fargo with obviously false customer contact information such as noname@wellsfargo.com.

## GENERAL ALLEGATIONS

49.   Plaintiffs were assigned the task of signing up Defendants' clients with accounts, were pressured by Defendants to meet aggressive sales quotas daily and monthly. Defendants strictly enforced and closely monitored sales quota system that made it difficult for Plaintiffs to keep their jobs without resorting to fraud.  Defendants knew or should have known that there were over 2 million fraudulently or unwanted accounts that were opened as a result of these unrealistic quotas.  Rather than taking any action to curtail these quotas when the 2 million

Law Offices of Jonathan J. Oxhhad, PC
11663 Sawtelle Blvd, Suite 220
Los Angeles, CA 90025

Law Offices of Jonathan J. Odshud, PC
1663 Sawtelle Blvd, Suite 220
Los Angeles, CA 90025

fraudulently or unwanted accounts were opened, Defendant did nothing to change its policy. Plaintiffs were thus encouraged and directed by Defendants' managing employees to use various illegal schemes to open accounts fraudulently. Most commonly fraudulent practice consisted coaching employees to open unauthorized fee generating accounts and/or secondary accounts for existing customers and often transferred funds to these accounts from the owners' other accounts, without clients' knowledge or consent. Plaintiffs who did not follow through with these fraudulent practices were retaliated against by poor performance reviews, demotions and subsequent terminations under the pretext of not meeting the sales quotas. Although this policy was known to top executives of Defendants, Plaintiffs, as bankers, were blamed for harm to clients and retaliated against by Defendants.

50.     During the last 10 years, Defendants have demoted and/or terminated Plaintiffs for failing to meet the sales quotas and engaging commonly practiced fraudulent schemes that were initiated by the Defendants' management. This practice results in significant monetary damages to Plaintiffs.

51.     Wells Fargo further stated in its 2014 Annual Report to the U.S. Securities Exchange Commission: "we continued to maintain our solid customer relationships across the Company, with retail banking household cross-sell of 6.17 products per household (November 2014); Wholesale Banking cross-sell of 7.2 products per relationship (September 2014); and Wealth, Brokerage and Retirement cross-sell of 10.49 products per retail banking household (November 2014)." Wells Fargo further stated in that same filing: "We believe there is more opportunity for cross-sell as we continue to earn more business from our customers. Our goal is eight products per household . . . ."

52.     In order to achieve its goal of eight accounts per household, Wells Fargo puts unrelenting pressure on its bankers to open numerous accounts per customer even if the customer does not need or does not want such accounts.

53.     Wells Fargo has strict quotas regulating the number of daily "solutions" that its bankers must reach; these "solutions" include the opening of all new banking and credit card accounts.

Managers constantly hound, berate, demean and threaten employees to meet these unreachable quotas. Managers often tell employees **to do whatever it takes to reach their quotas**.

54.     Employees who do not reach their quotas are often required to work hours beyond their typical work schedule without being compensated for that extra work time, and/or are threatened with demotion and/or termination.

55.     The quotas imposed by Wells Fargo on its employees are often not attainable because there simply are not enough customers who enter a branch on a daily basis for employees to meet their quotas through traditional means.

56.     Wells Fargo's bankers are thus naturally and predictably forced to resort to alternative means to meet quotas, including using high pressure sales tactics to coerce customers into opening additional accounts or using inaccurate or misleading information about potential accounts to induce customers to open them.

57.     Wells Fargo employees also pressure their own family members and friends to sign up for accounts to meet their quotas. Some employees report that they have "tapped out" every family member and friend for accounts. Others report that they spend holiday dinners trying to convince family members to sign up for accounts.  These accounts were often referred to as "secret stash" accounts and would be opened and closed periodically to help employees who decided to play that game from losing their employment. Management encourages employees to achieve "solutions" through family members. Since these accounts are opened by friends and family as favors, they are often unfunded, and can result in fees charged by Wells Fargo to its own employees' families or acquaintances, even for such "zero balance" accounts.

58.     Employees thus resort to gaming tactics to increase their "solutions," and meet minimum quotas. Gaming is so ingrained in the business of Wells Fargo that many of the tactics employed to meet these sky-high quotas have commonly-used names as mentioned above. Employees were, and are, instructed by management to lie to customers by telling them that each checking account automatically comes with a savings account, credit card, or other product such as life insurance, and/or "Express Send" (an online program that allows customers to send money to foreign countries).

Law Offices of Jonathan J. Delshad, PC
11663 Sawtelle Blvd. Suite 220
Los Angeles, CA 90025

59. When customers discover an unauthorized account and inquire of Wells Fargo about it, they are often informed that the products and services came with the authorized accounts automatically. Even in the face of customer complaints, the "bundling" continues. Customers who complain about receiving credit cards they did not request are advised by Wells Fargo to simply destroy the unrequested and unauthorized cards. However, simply destroying these unauthorized cards does not close the account or repair the impact to a customer's credit profile.

60. Because of Wells Fargo's on-going setting of unrealistic sales goals, Wells Fargo employees have engaged in, and continue to engage in, other gaming tactics, including:

a. Making misrepresentations to customers to get them to open additional accounts such as falsely stating: "you will incur a monthly fee on your checking account until you add a savings account."

b. Misrepresenting that additional accounts do not have monthly fees, when they actually do incur such fees.

c. Referring unauthorized, and therefore unfunded, accounts to collections because Wells Fargo's practices cause the accounts to have negative balances.

d. Targeting individuals holding Mexican Matriculada Consular cards because the lack of a Social Security Number makes it easier to open numerous fraudulent accounts. Wells Fargo employees provide false information to complaining customers, and advise many of these victims to ignore the unauthorized fees and letters from collection agencies because the lack of a Social Security number means the debt will not affect them.

e. Advising customers who do not want credit cards that they will be sent a credit card anyway, and to just tear it up when they receive it.

f. Targeting older customers who were less aware that they were being taken advantage of.

61. Employees could easily meet their sales quotas if they engaged in these illegal, fraudulent and improper sales tactics. Therefore, to encourage these fraudulent actions, Wells

Law Offices of Jonathan J. Delshad, PC
11663 Sanvelle Blvd, Suite 220
Los Angeles, CA 90025

Law Offices of Jonathan J. Delshad, PC
11663 Sawtelle Blvd. Suite 220
Los Angeles, CA 90025

1  Fargo implemented its sales quota system.  As a result, when employees failed to engage in
2  these behaviors, Wells Fargo illegally retaliated against them under the guise of stating that
3  they did not meet their sales quota.  Therefore, all employees who were demoted or fired
4  because they did not meet this sales quota were effectively demoted or fired because they
5  refused to participate and / or opposed to engage in fraudulent activity to meet those quotas as
6  was expected of them.

7  62.    The United States has strict laws against making false financial statements.

8  63.    Pursuant to the Gramm-Leach-Bliley Act, 15 United States Code section 6801, *et seq.*,
9  and the rules and regulations promulgated thereunder, financial institutions have a duty to keep
10  and protect the personal information of their customers from unauthorized access or misuse.
11  When an "institution determines that misuse of its information has occurred or is reasonably
12  possible, it should notify the affected customer as soon as possible. (70 Fed. Reg. 1575; 12
13  C.F.R. Part 30, App. B.)

14  64.    It is also illegal to engage in Securities Fraud by boosting stock prices as a result of
15  conduct which one knows to be fraudulent, such as the scam perpetrated by Wells Fargo as
16  stated above.

17  65.    Defendants are mandated by law to deter money laundering and assist in the
18  identification of criminal activities, tax evasion and regulatory violation through the Bank
19  Secrecy Act and Anti-Money Laundering (BSA/AML) as regulated by FinCEN (Financial
20  Crimes Enforcement Network) under the United States Treasury

21  66.    Additionally the USA Patriot Act (The Uniting and Strengthening America by
22  Providing Appropriate Tools Required to Intercept and Obstruct Terrorism) added
23  responsibilities to these laws requiring financial institutions to identify and deter international
24  money laundering.

25  67.    The BSA/AML and the USA Patriot Act impose strict bank policy, adherence and
26  oversight and carry with them substantial civil and criminal penalties on the financial
27  institution, its employees, officers and directors; if violated. Criminal penalties may include
28  fines of $500,000 and ten years imprisonment.

68.     The BSA/AML requires that Defendants have a policy, procedure and practice to comply fully and completely with the letter and the spirit of the Bank Secrecy Act. Each officer and employee is expected to know the requirements of the Acts and the related rules and regulations affecting their responsibilities.

69.     Defendants declared via policy, training, and written acknowledgment that each employee has an affirmative duty to execute the requirements of the BSA/AML and USA Patriot Act in a manner that is consistent and in compliance with its policies and procedures.

70.     Under the BSA/AML and USA Patriot Act, financial institutions, including Defendants, are required to file a Suspicious Activity Report ("SAR") when they identify or suspect an activity that involves insider abuse, criminal violation or any violation of the Bank Secrecy Act. Financial institutions, including Defendants, are not required to establish probable cause or prove the illegal conduct before filing such a report. Financial institutions, including Defendants, must file a SAR when they have a substantial basis for identifying one of its directors, officers, employees, or agents as having committed or aided in the commission of a criminal act.

71.     Opening "solutions" which are not needed, not supported by documentation, fraudulent, fake, or not requested by the customer may be considered activity that requires a SAR.

72.     Furthermore, Defendants are a federally insured financial institution regulated by the Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation ("FDIC"), and the Federal Reserve Bank.

73.     Defendant's employees have an obligation to assure decisions by the bank, protect customer deposits, shareholder equity, the insurance fund of the FDIC, the general banking public, and to comply with banking rules and regulations.

74.     Opening "solutions" which are not needed, not supported by documentation, fraudulent, fake, or not requested by the customer may be considered activity that violates FDIC regulations.

75.     Section 1057 of the Dodd-Frank Act prohibits employers engaged in providing consumer financial products or services, and employers that provide a material service in

Law Offices of Jonathan J. Delshad, PC
11663 Sarvedis Blvd, Suite 220
Los Angeles, CA 90025

Law Offices of Jonathan J. Delshad, PC
11663 Sawtelle Blvd, Suite 220
Los Angeles, CA 90025

connection with the provision of such products or services, from terminating or in any other way discriminating against a covered employee because the employee has (1) provided, caused to be provided, or is about to provide or cause to be provided, information relating to a violation of Title X of the Dodd-Frank Act or any other provision of law that is subject to the jurisdiction of the Bureau of Consumer Financial Protection (Bureau) to the employer, the Bureau, or a state, local, or federal government authority or law enforcement agency; (2) testified or will testify in any proceeding resulting from the administration or enforcement of Title X of the Dodd-Frank Act or any other provision of law that is subject to the jurisdiction of the Bureau; (3) filed, instituted, or caused to be filed or instituted any proceeding under any federal consumer financial law; or (4) objected to or refused to participate in any activity that the employee reasonably believed to be in violation of any law subject to the jurisdiction of, or enforceable by, the Bureau.

76.     The FLSA prohibits employers from discharging or otherwise discriminating against an employee because such employee filed a complaint or instituted any proceeding under the statute, testified or is about to testify in any such proceeding, or served or is about to serve on an industry committee. Employers who willfully violate the FLSA's anti-retaliation provisions may be fined up to $10,000 and imprisoned up to six months. Employers who retaliate against employees in violation of this provision shall be liable for legal and equitable relief, including, without limitation, reinstatement, the payment of lost wages, and an additional equal amount as liquidated damages. An action may be maintained against any employer, including a public agency, in any federal or state court of competent jurisdiction by any one or more employees.

77.     Sarbanes-Oxley prohibits publicly traded companies from discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against an employee because such employee provided information, caused information to be provided, otherwise assisted in an investigation or filed, testified, or participated in a proceeding regarding any conduct that the employee reasonably believes is a violation of Sarbanes-Oxley, any SEC rule or regulation, or any federal statute relating to fraud against shareholders, when the information or assistance is provided to a federal regulatory or law enforcement agency, any Member or

committee of Congress, or a person with supervisory authority over the employee or investigative authority for the employer, regarding any violation of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), 1348 (securities fraud against shareholders), or any SEC rule or regulation, or of any federal law regarding fraud against shareholders.

## FIRST CAUSE OF ACTION
### [Violation of Sarbanes-Oxley Act]

78.    Named Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

79.    Sarbanes-Oxley Act of 2002, among other things, prohibit any publicly-traded company or "any officer, employee . . . or agent of such company" from taking any action to "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee. who .provide[s] information or cause[s] information to be provided. . .regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to . . . a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)."

80.    As alleged above, Defendants terminated Plaintiffs because Plaintiffs opposed what they reasonably believed to be unlawful conduct and practices by Defendants which violated the securities laws and regulations identified above. By opposing / refusing to engage in "gaming" to meet their quotas, the Plaintiffs were engaging in protected activity and opposing practices that were violating the law.  It is now clear that the "gaming" and the fraudulent opening of over 2 million unauthorized accounts by Wells Fargo employees was an illegal attempt to boost Wells Fargo's stock price in violation of SEC regulations on reporting.

Law Offices of Jonathan J. Delshad, PC
11663 Santelle Blvd. Suite 220
Los Angeles, CA 90025

81.    In terminating Plaintiffs for these reasons and under these circumstances, Defendants violated the fundamental public policies embodied in the Sarbanes-Oxley Act of 2002, and other securities law provisions and regulations identified above.

82.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages, including, but not limited to, lost past and future wages and benefits and mental anguish and emotional suffering, all in an amount to be proven at trial and in excess of the jurisdictional minimum of this court.

83.    In doing the things herein alleged, Defendants were guilty of oppression, fraud and malice in that they, among other things, acted with a willful and conscious disregard for Plaintiffs' rights, insofar as the things alleged were attributable to employees of Defendants, said employees were employed by Defendants with advance knowledge of the unfitness of the employees and/or they were employed with a conscious disregard for the rights of others and/or Defendants authorized or ratified the wrongful conduct and/or there was advance knowledge, conscious disregard, authorization, ratification or act of oppression, fraud or malice on the part of an officer, director or managing agent of Defendants all entitling Plaintiffs to the recovery of exemplary and punitive damages.

## SECOND CAUSE OF ACTION
### [Violation Of The Fair Labor Standards Act]
### On behalf of Named Plaintiffs and the FLSA Collective.

84.    Certain subclass of the Named Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

85.    The FLSA, 29 U.S.C. § 207, requires employers to pay non-exempt employees one and one-half times the regular rate of pay for all hours worked over forty (40) hours per workweek.

86.    Defendant suffered and permitted Plaintiff and the FLSA Collective to routinely work more than forty (40) hours a workweek without overtime compensation.

87.    Defendants required a subclass of the Named Plaintiffs to work past closing and in excess of 8 hours a day to in order to satisfy their unrealistic quotas.  Wells Fargo required

Law Offices of Jonathan J. Delshad, PC
11663 Sawtelle Blvd, Suite 220
Los Angeles, CA 90025

Named Plaintiffs to work off the clock to meet their quotas or else be fired.  Wells Fargo did not pay Named Plaintiffs for such work and required them to work off the clock in violating the FLSA.

88.     Defendant's actions, policies, and practices described above violate the FLSA's overtime requirement by regularly and repeatedly failing to compensate Plaintiff and the FLSA Collective at the required overtime rate.

89.     As the direct and proximate result of Defendant's unlawful conduct, Plaintiff and the FLSA Collective have suffered and will continue to suffer a loss of income and other damages. Plaintiff and the FLSA Collective are entitled to liquidated damages and attorney's fees and costs incurred in connection with this claim.

90.     The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a). Defendant knew or showed reckless disregard for the fact that its compensation practices were in violation of these laws.

91.     In doing the things herein alleged, Defendants were guilty of oppression, fraud and malice in that they, among other things, acted with a willful and conscious disregard for Plaintiffs' rights, insofar as the things alleged were attributable to employees of Defendants, said employees were employed by Defendants with advance knowledge of the unfitness of the employees and/or they were employed with a conscious disregard for the rights of others and/or Defendants authorized or ratified the wrongful conduct and/or there was advance knowledge, conscious disregard, authorization, ratification or act of oppression, fraud or malice on the part of an officer, director or managing agent of Defendants all entitling Plaintiffs to the recovery of exemplary and punitive damages.

### THIRD CAUSE OF ACTION
**[Declaratory Judgment and Injunctive Relief]**
**On behalf of Plaintiffs.**

92.     Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

Law Offices of Jonathan J. Delshad, PC
11663 Sawtelle Blvd, Suite 220
Los Angeles, CA 90025

93.     An actual controversy exists between Named Plaintiffs and Defendants. Named Plaintiffs contend that Defendants violated Federal law in the ways and in the manner alleged above; Defendants contend to the contrary.

94.     Named Plaintiffs seek a declaration that the actions, policies and practices of Defendants as described above are unlawful and violate established public policy, as set forth above.

95.     Named Plaintiffs have no speedy, plain or adequate remedy in the ordinary course of law and will suffer irreparable damage unless Defendants are required to comply with state law, and the Court issues an injunction requiring Defendants to cease their unlawful conduct.

## FOURTH CAUSE OF ACTION
### [Violation of Dodd-Frank Act]

96.     Named Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

97.     Section 1057 of the Dodd-Frank Act prohibits employers engaged in providing consumer financial products or services, and employers that provide a material service in connection with the provision of such products or services, from terminating or in any other way discriminating against a covered employee because the employee has (1) provided, caused to be provided, or is about to provide or cause to be provided, information relating to a violation of Title X of the Dodd-Frank Act or any other provision of law that is subject to the jurisdiction of the Bureau of Consumer Financial Protection (Bureau) to the employer, the Bureau, or a state, local, or federal government authority or law enforcement agency; (2) testified or will testify in any proceeding resulting from the administration or enforcement of Title X of the Dodd-Frank Act or any other provision of law that is subject to the jurisdiction of the Bureau; (3) filed, instituted, or caused to be filed or instituted any proceeding under any federal consumer financial law; or (4) **objected to or refused to participate in any activity that the employee reasonably believed to be in violation of any law subject to the jurisdiction of, or enforceable by, the Bureau.**

Law Offices of Jonathan J. Delshad, PC
11663 Sawtelle Blvd, Suite 220
Los Angeles, CA 90025

Law Offices of Jonathan J. Delshad, PC
11663 Sawtelle Blvd. Suite 220
Los Angeles, CA 90025

98.    As alleged above, Defendants terminated Plaintiffs because Plaintiffs opposed what they reasonably believed to be unlawful conduct and practices by Defendants which violated the securities laws and regulations identified above. By opposing / refusing to engage in "gaming" to meet their quotas, the Plaintiffs were engaging in protected activity and opposing practices that were violating the law.  It is now clear that the "gaming" and the fraudulent opening of over 2 million unauthorized accounts by Wells Fargo employees was an illegal attempt to boost Wells Fargo's stock price in violation of SEC reporting regulations, among other things.

99.    By refusing to engage in "gaming" to meet quotas, the Plaintiffs opposed the illegal scam that was being perpetrated by Wells Fargo, from the CEO down.

100.    Because it was impossible to consistently meet a quota without engaging in "gaming," Plaintiffs who opposed or otherwise did not engage in the fraudulent acts that violated the laws set forth above could not meet their quotas on a consistent basis and were therefore demoted and/or fired.

101.    In terminating Named Plaintiffs for these reasons and under these circumstances, Defendants violated the Dodd-Frank Act and other securities law provisions and regulations identified above.

102.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages, including, but not limited to, lost past and future wages and benefits and mental anguish and emotional suffering, all in an amount to be proven at trial and in excess of the jurisdictional minimum of this court.

103.    In doing the things herein alleged, Defendants were guilty of oppression, fraud and malice in that they, among other things, acted with a willful and conscious disregard for Plaintiffs' rights, insofar as the things alleged were attributable to employees of Defendants, said employees were employed by Defendants with advance knowledge of the unfitness of the employees and/or they were employed with a conscious disregard for the rights of others and/or Defendants authorized or ratified the wrongful conduct and/or there was advance knowledge, conscious disregard, authorization, ratification or act of oppression, fraud or malice

Law Offices of Jonathan J. Delshad, PC
11663 Sunwille Blvd, Suite 220
Los Angeles, CA 90025

on the part of an officer, director or managing agent of Defendants all entitling Plaintiffs to the recovery of exemplary and punitive damages.

104.     Plaintiffs intend on filing a complaint with the Secretary of Labor concurrently with the filing of this lawsuit. Within 60 days after filing with the Secretary of Labor Plaintiffs will amend this complaint to remove this cause of action if the Secretary concludes that there is a reasonable cause to believe that a violation has occurred. Otherwise, Plaintiffs intend on requesting judicial review of the matter.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## **PRAYER FOR JUDGMENT**

Named Plaintiffs pray for judgment as follows:

1.     General, compensatory, and statutory damages in amounts to be proven at trial;

2.     For punitive damages according to proof at trial;

3.     For injunctive relief;

4.     For reasonable attorneys' fees, expert witness fees, and other litigation expenses;

5.     For costs of suit;

6.     For such other relief as the Court deems just and proper; and

7.     Total damages of $7,200,000,000 and possibly more, according to proof.

Dated: September 26, 2016

Law Offices of Jonathan J. Delshad

By:   Jonathan J. Delshad, Esq.
Attorney for Plaintiffs

Bridle v. Wells Fargo - Complaint For Damages